**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JANICE KEELS, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 04-6415 (WHW) |
| | : | |
| PASSAIC COUNTY JUDICIARY, et. al, | : | |
| Individually, Jointly, Severally and/or in the | : | |
| Alternative, Robert Cook, Michael Costible, | : | |
| and Carolyn Harrison, | : | |
| | : | |
| Defendants. | : | |

**Walls, Senior District Judge**

  Defendants Superior Court of New Jersey, Passiac Vicinage ("Passiac Vicinage"), Michael Costabile, Robert Cook, and Carolyn Harrison (collectively, the "Defendants")[1] move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all counts and on behalf of all defendants. Pursuant to Federal Rule of Civil Procedure 78, the Court decides this motion without oral argument. The Court grants Defendants' motion for summary judgment.

## BACKGROUND

  Plaintiff Janice Keels is a resident of Carteret, New Jersey and began work for the Superior Court of New Jersey, Passaic Vicinage as a Judiciary Clerk II ("JC 2 ") about October 12, 1999. She was assigned to the Family Division/Processing Unit. On August 11, 2003,

---

[1] Defendant State of New Jersey Judiciary, Passaic Vicinage, is incorrectly designated in the caption as Passaic County Judiciary, and Michael Costabile, is incorrectly designated in the capation as Michael Costible.

NOT FOR PUBLICATION

Plaintiff was terminated.  The following material facts are undisputed, except where indicated in this Opinion.[2]

      For the first several months of Plaintiff's employment, although Plaintiff contends that she received a satisfactory evaluation, Plaintiff's supervisor, Deborah Strover, noted that Plaintiff had poor interpersonal skills and difficulty interacting with co-workers and clients.  On May 22, 2000, Plaintiff approached Team Leader Robert Cook in front of other employees to criticize a co-worker, Sherian Seegers, and stated that she would hit Seegers if she had to and repeated "I'll hit her."  In accordance with Judiciary policy, Cook filed a security incident report regarding Plaintiff's threatening behavior.  On May 26, 2000, Plaintiff wrote her version of what had happened between her and Seegers, claiming that Seegers was rude and unprofessional.  On June 28, 2000, Plaintiff wrote to the Honorable Nestor F. Guzman, P.J.S.C., regarding the incident with Seegers.  Plaintiff also filed a grievance against Cook regarding the May 2000 incident.

      Principal Probation Officer George Gerro ("PPO Gerro") met with Plaintiff and her union representative to discuss that incident with Cook.  Plaintiff admitted that she made threatening comments regarding Seegers.  On July 2, 2000, after reviewing all relevant information, Richard Centanni, Passaic Vicinage trial court administrator ("TCA"), authorized issuance of a preliminary notice of disciplinary action against Plaintiff charging her with conduct unbecoming

---

    [2]  Plaintiff provided a statement of undisputed material facts with her opposition to Defendant's motion for summary judgment where she either admitted or denied Defendants' statement of undisputed material facts.  ( See Janice Keel's Statement of Undisputed Material Facts in Opposition of Defendant's Motion for Summary Judgment ("Pl.'s SOMF").)  Facts asserted by Defendants but denied by Plaintiff will be considered disputed.

NOT FOR PUBLICATION

a public employee contrary to N.J.A.C. 4A:2-2.3(a)6.  Plaintiff appealed and, while the appeal

was pending, settled for a two-day suspension.

On July 11, 2000, Plaintiff received her mid-year performance appraisal, in which

Strover, Plaintiff's supervisor, stated "Janice needs to develop interpersonal skills, speak with

staff and clients in a professional and respectful manner at all times.  She has to work on

becoming patient, and tolerant with staff, clients and supervisory management."  (Ex. 13 to

Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for

Summary Judgment ("Defs. SOMF").)  Plaintiff admits that her job performance for the period

of December 1999 to May 2000 was unsatisfactory, that she did not meet the required

competencies for her position as a JC 2, and that she was not eligible for a promotion.  The day

after Plaintiff received her mid-performance appraisal, on July 12, 2000, in response to her

request for a transfer to another division and in accordance with Judiciary policy, her resume was

forwarded to all of the Passaic Vicinage division managers for their consideration in the event

that a position for which Plaintiff was qualified became available.

The following events, admitted by Plaintiff, concern other acts that violated work policy

and orders by her superiors.  On August 1, 2000, Plaintiff left the workplace at 4:05 pm, twenty-

five minutes before the scheduled end of the work day, without permission, and falsely stated in

her official attendance record that she left the workplace at 4:30 pm.  On September 19, 2000, a

Passaic Vicinage hearing officer telephone called Ms. Margaret Strangeway, Plaintiff's

supervisor, complaining that Plaintiff sought to change a hearing date for a client.  Before the

hearing officer's call, Strangeway had made clear to Plaintiff that she could not change the

-3-

**NOT FOR PUBLICATION**

hearing date for that client.  On September 22, 2000, Plaintiff disobeyed Strangeway's request

that Plaintiff cover for a sick employee by completing the employee's emergent calendar.

Covering for a sick employee was part of Plaintiff's duties.

On September 29, 2000, Plaintiff entered the office of Mr. James McCoy, Assistant

Family Division Manager, when she was agitated, speaking loudly and with great emotion, about

two disciplinary actions against her.  Plaintiff discussed her personal problems and indicated that

she contemplated ending her life and requested permission to leave early and sign herself into a

hospital for psychiatric treatment.  Plaintiff applied for and was granted an unpaid leave of

absence from October 3, 2000 to October 26, 2000, under the Family Medical Leave Act

("FMLA").  She applied for and was granted two extension which would end on December 25,

2000.  She then asked for another extension, but did not follow proper procedures and was

denied.  On December 21, 2000, Michael Costabile, Vicinage Human Resources Division

Manager ("HRDM"), informed Plaintiff that no further leaves of absence could be granted due to

budget and staffing constraints, and advised Plaintiff that she was expected to return to work on

January 2, 2001.

On May 8, 2001, Plaintiff burst into Strangeway's office while Strangeway was meeting

with another employee and began yelling that she would not complete the court work assigned to

her.  Plaintiff refused to complete her assigned tasks as directed by Strangeway and stated "I'm

not going to do it, write me up!"  Strangeway documented the incident and stated that Plaintiff's

behavior was unprofessional, rude, and inappropriate.  Strangeway further stated that Plaintiff's

"angry demeanor was both verbally abusive and physically threatening," making her feel "very

-4-

NOT FOR PUBLICATION

uncomfortable." (Ex. 31 of Defs. SOMF.) On May 9, 2001, Strangeway was unable to locate Plaintiff for approximately four hours during the work hours of 12:45 pm to 3:50 pm. Plaintiff filed grievances against Strangeway regarding Plaintiff's refusal to perform assigned work and for her absence from her workstation. On May 10, 2001, Plaintiff wrote Henry J. Bradle, FCDM, regarding her receiving additional tasks from Strangeway.

On May 17, 2001, Plaintiff and several other Passaic Vicinage employees discussed a recent news story regarding an incident with a fourteen-year old Florida student who shot his teacher. Upon hearing the discussion, Team Leader Mary Criangle asked the group to disperse, which they did. Criangle then heard Plaintiff say "If I had a gun, I'd use it on some people around here," which Plaintiff repeated a second time. Plaintiff denies ever making this statement. (See Pl.s' SOMF, at ¶¶ 39, 40.)

PPO Gerro and Court Services Supervisor Jennifer Adamski ("CSS Adamski") conducted an investigation of the May 17, 2001 incident and summarized their findings, which noted that Criangle was not only concerned by Plaintiff's comments but was intimidated and fearful of Plaintiff because she often displayed "erratic behavior, talked to herself, and her on-going criticism of all supervisors." After a thorough investigation into the three incidents in May 2001, the Passaic Vicinage determined that the May 8, 2001 incident warranted charging Plaintiff with insubordination contrary to N.J.A.C. 4A:2-2.3(a)(2), the May 9, 2001 incident warranted charging Plaintiff with neglect of duty contrary to N.J.A.C. 4A:2-2.3(a)7, and the May 17, 2001 incident ("If I had a gun . . .") warranted charging Plaintiff with conduct unbecoming a public employee contrary to N.J.A.C. 4A:2-2.3(a)6.

NOT FOR PUBLICATION

Plaintiff appealed the disciplinary charges which was heard on November 20, 2001 by Nancy Mahony, Esq., a hearing officer employed by the Administrative Office of the Courts ("AOC").  On January 28, 2002, Mahony found that Plaintiff made the statement "If I had a gun . . . ", that Plaintiff's May 17, 2001 conduct constituted conduct unbecoming a public employee, that Plaintiff's May 8, 2001 behavior constituted insubordination, and that Plaintiff's May 9, 2001 conduct constituted neglect of duty.  Mahony also found that Passaic Vicinage's request for a six- to ten-day suspension was fair and appropriate.

Plaintiff appealed Mahony's recommended decision to the Merit System Board ("MSB"), who transferred the matter to the New Jersey Office of Administrative Law ("OAL") to conduct a de novo evidentiary hearing, which was conducted before an Administrative Law Judge ("ALJ") on February 28, 2003 and May 7, 2003.  The ALJ upheld Mahony's findings and conclusions.  The MSB adopted the ALJ's decision.  Plaintiff did not exercise her right of appeal, pursuant to N.J. Court Rule 2:2-3(a)(2) and N.J. Admin. Code § 10:120A-2.8, to the Superior Court of New Jersey, Appellate Division.

On June 20, 2001, Plaintiff received her unsatisfactory performance appraisal for the period of December 1, 2000 to May 31, 2001.  In Plaintiff's performance appraisal, Strangeway wrote:

> Janice must work on attaining interpersonal skills in dealing with co-workers, supervisors, and client[s] . . . . Janice needs to learn to knock on doors and not barge into offices.  She must learn not to react with hostility when either given a work assignment or work direction associated with the assignment.  She needs to work on this response.  Janice needs to acquire a professional office demeanor; learn appropriate communication skills; and to seek all available training to assist her to reach these goals.

NOT FOR PUBLICATION

(Ex. 41 to Defs. SOMF.)  Plaintiff's overall performance rating was unsatisfactory and it was noted that she failed to meet the competencies necessary for advancement.  The next day, June 21, 2002, Plaintiff requested an appeal of her performance appraisal and filed a grievance against Strangeway regarding her performance appraisal.  On December 31, 2001, all Plaintiff's outstanding grievances against Strangeway and Criangle were denied.

On June 27, 2001, Plaintiff filed a discrimination complaint with the Administrative Office of the Courts ("AOC") Office of Equal Employment Opportunity/Affirmative Action ("EEO/AA") against PPO Gerro and Strangeway alleging discrimination on the bases of race and retaliation.  Her allegations were investigated by the AOC's Regional EEO/AA Investigator, Lawrence Bethea, who determined that Plaintiff's allegations could not be substantiated.  Trial court administrator Centanni accepted Bethea's report and dismissed Plaintiff's EEO/AA complaint.  Plaintiff failed to exercise her right to appeal the dismissal of her EEO/AA complaint to the administrative director of the AOC.

In June and July 2001, Plaintiff was treated by Dr. Jeffrey Miller at Hand Surgery & Rehabilitation of North Jersey, who diagnosed her for intersection syndrome and carpal tunnel syndrome but permitted her to work full duty with no restrictions.  After those diagnoses, Plaintiff was transferred from her secretarial position in the calendar unit to a receptionist position in the processing unit.  She was assigned to the division's receptionist desk where she was responsible for greeting clients, disseminating intake information, making copies, and contacting the appropriate staff to assist clients in a timely manner.  Costabile directed McCoy to ensure that Plaintiff's keyboard was ergonomically correct.

-7-

NOT FOR PUBLICATION

On December 7, 2001, Plaintiff received her performance appraisal for the appraisal period of December 2000 to November 2001 and received an overall satisfactory review. Plaintiff's supervisor, Jacqueline Powell, noted that since her transfer, Plaintiff had made strides to improve her interpersonal skill and to take responsibility for her actions.

On March 5, 2002, Plaintiff wrote to McCoy and requested that she be "removed from the customer service area and placed within the unit. Cindy Thompson and PPO Gerro were alerted to Plaintiff's request should a position for which Plaintiff was qualified became available. On August 30, 2002, Plaintiff received her mid-year performance evaluation. Plaintiff failed to meet the competencies for her position by failing to satisfy all the requirements of the career progression eligibility form. Specifically, it was noted that Plaintiff still needed to develop advanced customer service skills. Plaintiff refused to sign the evaluation.

On November 7, 2002, Defendant senior probation officer Carolyn Harrison was assisting a client in the family division intake unit when Harrison and Plaintiff engaged in a short conservation. The content of the conversation is disputed but not critical to what had happened, which has been admitted by Plaintiff. Harrison re-entered the intake unit with the client. Plaintiff stood with her back towards Harrison. In the presence of Harrison's client and other Passaic Vicinage employees, Plaintiff suddenly spun around, leaned down, and kissed Harrison on the lips making a loud smacking sound. When Harrison spoke to Plaintiff, saying "I know you did not just put your lips on me," Plaintiff responded by giggling. Harrison reported the incident to her supervisor and approached her supervisor again on November 14, 2002 about filing a sexual harassment complaint.

NOT FOR PUBLICATION

On November 20, 2002, Plaintiff's supervisors, Adamski and Cook, met with Plaintiff and her union representative to discuss an incident the same morning where Plaintiff was asked and refused to perform her duties at the front desk. Cook conducted an investigation into the November 20 incident, collected witness statements and prepared a memorandum. Also, on November 20, 2002, Thomson contacted Sharon Kinney, the Passaic Vicinage EEO/AA Officer, regarding the November 7, 2002 kissing incident. Kinney conducted an investigation into the sexual harassment charges arising from the November 7, 2002 kissing incident. Plaintiff did not deny that the kissing took place, however, she alleged that it was unintentional. She stated that Harrison walked into her and their lips touched.

On December 2, 2002, Plaintiff wrote to McCoy, requesting a transfer to another vicinage or division within the Passaic Vicinage, stating: "It is time for a change to challenge something different." (Ex. 62 to Defs. SOMF). Plaintiff's request was forwarded to Passaic Vicinage's sister vicinage, the Bergen Vicinage, for its consideration in the event that a position for which Plaintiff was qualified became available. On December 17, 2002, Plaintiff received her final 2002 performance summary. Plaintiff again failed to meet competency standards due to issues with sensitivity and friendly service, making her ineligible for a promotion.

On December 20, 2002, due to the conflicting versions regarding the kissing incident, EEO/AA Officer Kinney determined that the matter could not be resolved at the Passaic Vicinage level and, in accordance with Judiciary policy, it was forwarded to the AOC for further investigation. After further investigation, on March 3, 2003, the Passaic Vicinage issued Plaintiff a preliminary notice of disciplinary action with regard to the kissing incident of

-9-

**NOT FOR PUBLICATION**

November 7 and the insubordination incident of November 20.  Plaintiff was charged with conduct unbecoming a public employee contrary to N.J.A.C. 4A:2-2.3(a)6, sexual harassment contrary to N.J.A.C. 4A:2-2.3(a)9, and other sufficient cause contrary to N.J.A.C. 4A:2-2.3(a)11. Plaintiff requested a departmental hearing.

Between March 14, 2003 and May 1, 2003, Plaintiff wrote and distributed memos regarding alleged inappropriate behavior by Harrison.  Plaintiff alleged that on March 14, 2003, Harrison was loud and sarcastic towards Plaintiff when Harrison asked Plaintiff to relieve an investigator from working the front desk.  On April 10, 2003, Plaintiff requested assistance at the front desk but no one was unavailable to help her.  Later that day, Plaintiff wrote a memo to Cook accusing Harrison of insubordination and neglect of duty for failing to help her.  On May 1, 2003, Harrison was in her office assisting a client.  Plaintiff entered the room and began chewing gum and smacking her lips loudly.  Harrison reminded Plaintiff that she was working with a client.  Plaintiff said, "I don't know why this person is talking to me now, she never says anything to me any other time."   (Ex. 72 to Defs. SOMF.)  Plaintiff then began chewing and smacking her lips louder than before.  Plaintiff later wrote a memo to Cook complaining that Harrison was rude and sarcastic, and alleging that Plaintiff was forced to leave work to keep from being harassed. Plaintiff points out that no action was taken against Harrison despite Plaintiff's complaints.

About May 26, 2003, Plaintiff was served with a preliminary notice of disciplinary action and notice of informal pre-termination hearing for filing memos regarding alleged inappropriate behavior by Harrison in retaliation against Harrison for filing the sexual harassment complaint.

-10-

**NOT FOR PUBLICATION**

The notice charged Plaintiff with conduct unbecoming a public employee contrary to N.J.A.C.

4A:2-2.3(a)6, and other sufficient cause contrary to N.J.A.C. 4A:2-2.3(a)11.  The notice

specifically alleged that Plaintiff engaged in rude and threatening behavior toward her co-workers

and wrote harassing letters to Cook about Harrison.  Plaintiff requested a departmental hearing.

Plaintiff was immediately suspended pending the outcome of the departmental hearing.

On May 27, 2003, Plaintiff's counsel requested that she be restored to her position

pending the outcome of the AOC departmental hearing.  That request was denied.  On June 13

and July 14, 2003, a departmental hearing was held before hearing officer Mahony as to the

March 3, 2003 preliminary notice of disciplinary action charging Plaintiff with conduct

unbecoming a public employee contrary to N.J.A.C. 4A:2-2.3(a)6, sexual harassment

contrary to N.J.A.C. 4A:2-2.3(a)11, with regard to the kissing incident of November 7, 2002 and

the insubordination incident of November 20, 2002.  Plaintiff was represented by counsel.

During the hearing, fourteen witnesses were examined and fourteen documents were placed into

the record as exhibits.

After hearing all the witness testimony and considering all documents submitted, Mahony

issued her recommended decision on July 31, 2003.  Mahony concluded that the Passaic

Vicinage demonstrated by a preponderance of the credible evidence that Plaintiff intentionally

kissed Harrison on the lips in violation of the Judiciary's sexual harassment policy and in

violation of the Judiciary's code of conduct.  Mahony stated:

> I find that Ms. Keels inappropriately kissed Ms. Harrison on the lips and did so with
> the intention of shocking and humiliating her because she resented Ms. Harrison's
> position and self-confidence.  Indeed, Ms. Keels did not produce any competent
> evidence to the contrary.  It is apparent that, before September 2002, when Ms.

NOT FOR PUBLICATION

> Harrison came to the Intake Unit, Ms. Keels believed she could intimidate her co-
> workers.  Indeed, Mr. Cook testified that at least two or three people came to him in
> the past because they felt uncomfortable around Ms. Keels.  Ms. Keels was
> seemingly amused by the fact that she intimated the workplace.  According to Ms.
> Harrison, Ms. Keels "giggled" when she told her that she could do whatever she
> wanted at work because people were afraid of her . . . .  Ms. Harrison made it clear
> to Ms. Keels that she should not tolerate her obstinacy and intimidation . . . .  Simply
> put, [Ms. Keels] wanted to stun and embarrass Ms. Harrison in order to bring her
> down a peg.

(Ex. 56 to Defs. SOMF.)  Mahony concluded that the penalty of termination imposed by the

Passaic Vicinage was appropriate and should be upheld.

On August 11, 2003, Plaintiff received a final notice of disciplinary action, which

terminated her employment effective immediately.  On August 12, 2003, the Honorable Robert J.

Passero, Passaic Vicinage assignment Judge, accepted Mahony's recommendation.  On August

25, 2003, Plaintiff was paid a lump sum for salary earned while suspended.  On October 24,

2003, Plaintiff filed an appeal with the MSB well beyond the twenty-day filing deadline set forth

in N.J.S.A. 11A:2-15 and N.J.A.C. 4A:2-2.8(a).  The appeal was transmitted to the OAL and

dismissed as untimely.

On November 18, 2003, a hearing was held before hearing officer Craig D. Bailey, Esq.,

as to the preliminary notice of disciplinary action, which charged Plaintiff with conduct

unbecoming a public employee contrary to N.J.A.C. 4A:2-2.3(a)6, and other sufficient cause

contrary to N.J.A.C. 4A:2-2.3(a)11, regarding Plaintiff's retaliatory memos alleging

inappropriate behavior by SPO Harrison.  Bailey conducted a hearing wherein he heard testimony

from seven witnesses and received twelve documents into evidence.  On January 27, 2004, after

NOT FOR PUBLICATION

reviewing all the evidence presented, Bailey issued his recommended decision.  Specifically, he

stated:

> I find Ms. Keels misrepresented the events addressed in the memoranda in order to retaliate against Ms. Harrison for filing a harassment complaint against Ms. Keels over the November kissing incident.  I find that such conduct is inappropriate and constitutes conduct unbecoming a public employee.

(Ex. 77 to Defs. SOMF.)  On February 3, 2004, the Judge Passero accepted Bailey's

recommendation.  On February 9, 2004, Plaintiff was issued a final notice of disciplinary action,

terminating her employment, effective August 11, 2003.

On February 19, 2004, Plaintiff filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") and Division of Civil Rights, alleging the

disparate treatment that Chris Cartucci, a white male, received for touching a co-worker on the

"butt."  Plaintiff stated that Cartucci received a sexual harassment class discipline while she was

terminated.  On February 26, 2004, Plaintiff filed another charge of discrimination with the

EEOC.  That charge alleges that:

> On November 7, 2002, Carolyn Harrison (Black), Sr. Probation Officer and I had a discussion.  As I angrily left the office, she walked into me and our lips touched . . . .  SPO Harrison filed a sexual harassment charge against me . . . .  During the period March 14, 2003 to May 1, 2003, I filed letters of complaints against SPO Harrison.

(Ex. 80 to Defs. SOMF.)  Plaintiff claimed that she was "discriminated against in retaliation for

filing a complaint" on the basis of her sex, race, color, and disability in violation of Title VII of

the Civil Rights Act and the Americans with Disabilities Act.  (Id.)  On September 23, 2004, the

EEOC issued a dismissal and notice of rights letter stating that its investigation of Plaintiff's

charge produced no information that could establish a violation of any statute.

-13-

NOT FOR PUBLICATION

Meanwhile, Plaintiff appealed her termination to the MSB.  The matter was forwarded to the New Jersey Office of Administrative Law for determination as a contested case, pursuant to N.J.A.C. 52:14B-1 to -15 and N.J.S.A. 52:14F-1 to -13.  A hearing was scheduled for January 26, 2005; however, at the request of Plaintiff's counsel, an adjournment was granted and the matter was rescheduled for May 18, 2005.

On April 25, 2005, the Passaic Vicinage filed a motion to dismiss the OAL appeal.  After several extensions of time were granted, Plaintiff submitted a late reply.  On September 12, 2005, the Administrative Law Judge ("ALJ") found that Plaintiff failed to file her MSB appeal of her termination within twenty days of receipt of her final notice of disciplinary action as required by N.J.S.A. 11A:2-15 and N.J.A.C. 4A:2-2.8(a).  The MSB accepted and adopted the ALJ's decision on October 21, 2005.  Plaintiff did not exercise her right of appeal, pursuant to N.J. Court Rule 2:2-3(a)(2) and N.J. Admin. Code § 10:120A-2.8, to the Superior Court of New Jersey, Appellate Division.

After Plaintiff's termination and exhaustion of the appeal process, she brought this action against Defendants.  (Amended Complaint, Keels v. Passaic County Judiciary, No. 04-6415 (D.N.J. Aug. 30, 2005) ("Am. Compl.").).  In this action, she asserts seven counts of relief.[3]  (Id.) Although the Amended Complaint is not well-organized and Plaintiff asserts multiple claims within each count, the Court has the following understanding of all claims brought by Plaintiff. Plaintiff asserts that Defendants violated her First Amendment right to free speech and Fourth

---

[3]  Although the fifth claim for relief is missing in the Amended Complaint, the fifth claim for relief is asserted in the Original Complaint.  Plaintiff states that this action arises under 42 U.S.C. § 1981, but no where in both Complaint does Plaintiff assert a section 1981 action.

-14-

NOT FOR PUBLICATION

Amendment rights of due process, equal protection and privileges and immunities via 42 U.S.C.

§§ 1983, 1985 and 1986.  Plaintiff also asserts that Defendants discriminated against her based

on her race, color, gender, age, disability and national origin and created a hostile work

environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title

VII") and discriminated against her because of her disability in violation of Title I of the

Americans with Disabilities Action of 1990 ("ADA"), 42 U.S.C. § 12111-12117.  Lastly,

Plaintiff brings New Jersey state law claims, asserting that Defendants violated the Conscientious

Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1, et. seq. and the New Jersey Tort

Claims Act when Defendants took action against her and terminated her for filing grievances.

Defendants filed a motion for summary judgment on all counts, asserting that they

terminated Plaintiff for cause.  Reviewing Plaintiff's brief in opposition to Defendants' motion

for summary judgment, the Court notes that Plaintiff's brief fails to provide any meaningful

discussion of how the law apply the facts.  Plaintiff's brief summarizes the applicable law in the

case and then summarily concludes that violations of Plaintiff's rights have occurred.  As shown

in this Opinion's lengthy recitation of the undisputed material facts, this case is ripe for summary

judgment as there are no genuine issues of material fact.

## **STANDARD OF REVIEW**

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and the moving party is entitled to a judgment as a matter of law.'"  Celotex

NOT FOR PUBLICATION

Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion

for summary judgment, the court must construe the facts and inferences in a light most favorable

to the non-moving party.  Pollock v Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir.

1986).  The role of the court is not "to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249 (1986).  A genuine issue of material fact exists only if the evidence presented

would enable a reasonable jury to return a verdict for the non-movant.  See Anderson, 477 U.S.

at 248.  Summary judgment must be granted if no reasonable trier of fact could find for the non-

moving party.  See id. at 249.

     The non-moving party may not defeat summary judgment by simply resting on the

argument that the record contains facts sufficient to support his claims.  See Big Apple BMW,

Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 507 U.S.

912 (1995); O'Donnell v. United States, 891 F.2d 1079, 1082 (3d Cir. 1989).  Rather, the non-

moving party must go beyond the pleadings and, by affidavits or other evidence, designate

specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324; Fed. R.

Civ. P. 56(e).  Such affidavits must be based "on personal knowledge," establish "such facts

which would be admissible," and "show affirmatively that the affiant is competent to testify in all

matters stated therein."  Maldonado v. Ramirez, 757 F.2d 48, 50 (3d Cir. 1985); see also 6 J.

Moore, W. Taggert & J. Wicker Moore's Federal Practice § 56.22[1] (2d ed. 1985).

"[C]onclusory statements, general denials, and factual allegations not based on personal

knowledge [are] insufficient to avoid summary judgment."  Olympic Junior, Inc. v. David

-16-

NOT FOR PUBLICATION

Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972); see also First Nat'l Bank of Ariz. v. Cities

Service Co., 391 U.S. 253, 288-90 (1968); Gostin v. Nelson, 363 F.2d 371 (3d Cir. 1966).

Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v.

Harris, --- U.S. ---, 127 S. Ct. 1769, 1776 (2007).  To prevail on a motion for summary judgment,

the non-moving party must "make a showing sufficient to establish the existence of [every]

element essential to that party's case, and on which that party will bear the burden of proof at

trial." Celotex, 477 U.S. at 322.


**DISCUSSION**

I.       **Sections 1983, 1985, 1986, Title VII and ADA Claims**

        Plaintiff asserts claims under sections 1983, 1985 and 1986 for violations of her First and

Fourteenth Amendment rights, a Title VII claim for retaliation, unlawful termination and hostile

work environment, and an ADA claim for unlawful termination and failure to provide reasonable

accommodation.

        In the Third Circuit, the legal analysis governing claims of discriminatory treatment in the

employment context under 42 U.S.C. § 1983, Title VII and ADA is the burden-shifting

framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and its progeny,

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) and St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). See Shaner v. Synthes (USA), 204 F.3d 494, 500

-17-

**NOT FOR PUBLICATION**

(3d Cir. 2000) (finding the Title VII <u>McDonnell Douglas</u> burden-shifting rules applicable in the

ADA context); <u>Stewart v. Rutgers, The State University</u>, 120 F.3d 426, 432 (3d Cir. 1997)(citing

<u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 186 (1989)) (finding <u>McDonnell</u>

<u>Douglas-Burdine</u> framework applicable to claims under 42 U.S.C. §§ 1981 and 1983).

      Although the Court is unaware of a Third Circuit case which applies the <u>McDonnell</u>

<u>Douglas-Burdine</u> framework to claims under 42 U.S.C. § 1985, many other circuit courts and

district courts have held that the <u>McDonnell Douglas-Burdine</u> framework applies to

<u>discrimination</u> claims under 42 U.S.C. § 1985 (emphasis added).[4]  Here, Plaintiff's section 1985

claim is that Defendants engaged in a "conspir[acy] for the purpose of depriving Plaintiff of the

equal protection of the laws and of equal privileges and immunities under the law."  (Am.

Compl., Second Claim for Relief, ¶¶ 6, 11.)  Plaintiff's claim is based on 42 U.S.C. § 1985(3).

"To establish a violation of section 1985(3), the plaintiff must allege and prove: (1) a conspiracy

motivated by invidious discriminatory animus, (2) for the purpose of depriving, either directly or

indirectly, any person or class of persons of equal protection of the laws, or of equal privileges

---

      [4] 42 U.S.C. § 1985 provides for three types of remedies.  42 U.S.C. § 1985(3)
specifically addresses discrimination claims for deprivation of rights and privileges.  In these
types of discrimination claims, many courts have applied the <u>McDonnell Douglas-Burdine</u>
framework.  <u>See</u> <u>Vakilian v. Shaw</u>, 335 F.3d 509, 520 (6th Cir. 2003) ("[W]e employed the
<u>McDonnell Douglas</u> burden-shifting framework in the context of a § 1985  claim alleging
discrimination."); <u>Crawford v. Signet Bank</u>, 179 F.3d 926 (D.C. Cir. 1999) (applying the
<u>McDonnell Douglas</u> burden-shifting framework to a section 1985 claim); <u>Richmond v. Board of</u>
<u>Regents of the Univ. of Minn.</u>, 957 F.2d 595 (8th Cir. 1992) (applying the <u>McDonnell Douglas</u>
analysis to Title VII, § 1981, § 1985, and the ADA); <u>Norris v. Housing Authority of City of</u>
<u>Galveston</u>, 980 F. Supp. 885, 901 (S.D. Tex. 1997) (stating that in the Fifth Circuit, "the burden
shifting framework of <u>McDonnell Douglas/Burdine</u> applies to Plaintiff's § 1981, § 1983, and  §
1985  claims.") (citing <u>Armstrong v. City of Dallas</u>, 997 F.2d 62, 65 n. 2 (5th Cir.1993))

-18-

NOT FOR PUBLICATION

and immunities under the laws, (3) an act in furtherance of the conspiracy; and (4) as a result, a person either is injured in his person or deprived of any right or privilege of a citizen of the United States."  Silvestre v. Bell Atlantic Corp., 973 F. Supp. 475, 484 (D.N.J. 1997) (citing Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268 (1993).)  The Court will apply the McDonnell Douglas-Burdine framework to Plaintiff's discrimination claim under 42 U.S.C. § 1985(3) because section 1985(3) requires Plaintiff to establish "discriminatory animus" and the McDonnell Douglas framework addresses the shifting-burden of proving "discriminatory animus."

There are three steps in the burden-shifting framework under McDonnell Douglas.  First, a plaintiff has the initial burden of establishing a prima facie case either by providing direct evidence of intentional discrimination or circumstantial evidence that would raise the inference that the defendants' conduct was motivated by discriminatory animus.  See Burdine, 450 U.S. 248, 252-53; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).  To establish a prima facie case for employment discrimination, the plaintiff must demonstrate that he: (1) belongs to a protected class; (2) was qualified for the position; (3) was fired or not offered the job; and (4) was replaced by a person outside the protected group.  See Hicks, 509 U.S. at 506.

Second, once the plaintiff "succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" Burdine, 450 U.S. at 252-53.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves, 530 U.S. at 142 (citing Hicks, 509 U.S. at 509).

NOT FOR PUBLICATION

The defendant satisfies this light burden by introducing evidence which, taken as true, would permit a trier of fact to conclude that unlawful discrimination was not the reason for the discharge or the failure to hire. See Burdine, 450 U.S. at 254-56.  The evidence submitted by the defendant need only raise a genuine issue of material fact as to whether it discriminated against the plaintiff.  Id. at 254 n.7.

Third, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 252-53.  "[A]lthough the presumption of discrimination 'drops out of the picture' once the defendant meets the burden of production ... the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.'" Reeves, 530 U.S. at 143 (quoting Hicks, 509 U.S. at 511).  The plaintiff must convince the factfinder "'both that the reason was false, and that discrimination was the real reason.'" Shaner, 204 F.3d at 501 (quoting Jones v. School Dist. Of Philadelphia, 198 F.3d 403, 412-13 (3d Cir. 1999) (internal citations omitted)).

The Third Circuit has outlined the following standard as to the amount of evidence necessary to survive a motion for summary judgment when discrediting an employer's proffered reasons:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  (Citations omitted.) Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

NOT FOR PUBLICATION

> legitimate reasons for its action that a reasonable factfinder could rationally find
> them "unworthy of credence," (citations omitted), and hence infer "that the employer
> did not act for [the asserted] non-discriminatory reasons."

Fuentes, 32 F.3d at 764 -65.

Even if the Court were to assume that Plaintiff established a prima facie case for a section

1983 claim, a section 1985 claim, a Title VII claim and an ADA claim based on Plaintiffs'

conclusory allegations, Defendants have produced more than sufficient evidence that Defendants

had legitimate reasons for not promoting Plaintiff and for terminating her employment.

Defendants provided evidence, which is admitted by Plaintiff, that she received

unsatisfactory performance evaluations, stating that she needed to improve her interpersonal

skills and that she repeatedly responded in a hostile and threatening manner to direction from

supervisors. (Defs. Response to Plaintiff's Statement of Undisputed Material Facts, at ¶¶ 3-4,

15-16, 53-55, 75, 89.) ("Defs. RSOMF") Plaintiff admits that due to her failing performance

evaluations, she was not eligible for a promotion. (Defs. RSOMF, at ¶¶ 3-4,15-16, 53-55, 75,

89.) Plaintiff admits that her transfer requests were forwarded to the appropriate managers for

their consideration in the event that a position for which she was qualified became available.

(Defs. RSOMF, at ¶¶ 17, 29, 64-67, 74, 87.)

Plaintiff admits that during her four years of employment with the Judiciary, she was

charged with or found to have threatened to hit another employee, threatened to bring a gun into

the workplace, and assaulted another female employee by kissing her on the lips against her will.[5]

_____

[5] Plaintiff continues to assert that the kissing incident was accidental. Whether that was
accidental is not the point. That she was found to have sexually harassed a co-worker is a
legitimate reason supporting Defendants' argument that they did not terminate her with

NOT FOR PUBLICATION

(Defs. RSOMF, at ¶¶ 5-10, 39-45, 76-78.)  Plaintiff admits that she was present with either her

union representative or her counsel at disciplinary hearings and had opportunities for appeal.

(Defs. RSOMF, at ¶¶ 8-11, 39, 42-52, 56-58, 82-86, 90, 97-111.)  Plaintiff admits that her

grievances were adjudicated.  (Defs. RSOMF, at ¶¶ 9-10, 42-51.)

Plaintiff has not produced any evidence that Defendants' reasons were a pretext for

discrimination.  Based on all evidence presented by Defendants and admitted by Plaintiff, no

rational juror could conclude that Defendants failed to promote Plaintiff or terminated Plaintiff

based on her sex, race, color, nationality or disability in violation of section 1983, section 1985,

Title VII or the ADA.  Defendants' motion for summary judgment against Plaintiff's section

1983, section 1985, Title VII and ADA claims are granted.

Because Plaintiff cannot establish a section 1985 claim, her section 1986, which is based

on a section 1985 claim, fails.  See Rogin v. Bensalem Twp., 616 F.2d 680, 696 (3d Cir. 1980)

("Because transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if

the claimant does not set forth a cause of action under the latter, its claim under the former

necessarily must fail also.").  Defendants' motion for summary judgment against Plaintiff's

section 1986 claim is granted.

**II.     New Jersey State Law Claims**

**A.     New Jersey Conscientious Employee Protection Act (CEPA)**

Plaintiff alleges that Defendants violated CEPA when they retaliated against her for filing

grievances against Defendant Cook.  (Am. Compl., Second Claim for Relief, at ¶ 8.)  CEPA

discriminatory animus.

-22-

NOT FOR PUBLICATION

prohibits employers from taking "retaliatory action" against an employee who objects to "any activity, policy or practice which the employee reasonably believes" is in violation of applicable law.  Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 404 (3d Cir. 2007) (citing N.J.S.A. 34:19-3(c)(1)).  "To prevail on a claim under this provision, a plaintiff must establish that (1) he reasonably believed that his employer's conduct was violating a law or rule or regulation promulgated pursuant to law, (2) he objected to the conduct, (3) an adverse employment action was taken against him, and (4) a causal connection exists between the whistleblowing activity and the adverse employment action."  Id. (citing Dzwonar v. McDevitt, 177 N.J. 451, 828 A.2d 893, 900 (2003)).

Plaintiff has failed to meet her burden of establishing a prima facie case under CEPA. Plaintiff presented no evidence, and none can be found on the record, that Defendants were "violating a law or rule or regulation promulgated pursuant to law."  Plaintiff presented no evidence that she was engaged in any "whistle-blowing" activity.  Plaintiff presented no evidence of any casual connection between any alleged whistle-blowing activity and the adverse employment action.  With no evidence to support Plaintiff's allegations, no rational juror could find that Defendants violated CEPA.  Defendants' motion for summary judgment against Plaintiff's CEPA claim is granted.

### B.    New Jersey Common Law Tort Claim

"Tort actions brought under New Jersey law are governed by New Jersey's Tort Claims Act ("TCA") which applies to tort actions against public entities or their employees."  Brennan v. Norton, 350 F.3d 399, 431 (3d Cir. 2003).  Plaintiff generally avers that "[a]s a direct and

**NOT FOR PUBLICATION**

proximate result of the combined negligence of the defendant aforesaid, plaintiff suffered serious physical and emotional injuries of both a temporary and permanent nature, considerable pain, anguish and suffering, shock, loss of wages and other special damages."  (Am. Compl., Fourth Claim of Relief, at ¶ 27.)

N.J. Stat. Ann. § 59:8-3 governs TCA claims against a public entity and its employees, stating that "[n]o action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter."  N.J. Stat. Ann. § 59:8-3.  The TCA has a 90-day notice requirement.  Brennan, 350 F.3d at 431; N.J. Stat. Ann. § 59:8-8 (imposing a ninety-day deadline after the accrual of a cause of action for injury or damage to person or property for the plaintiff to file his claim with the appropriate public entity).  "Failure to satisfy the notice requirement of the TCA is an absolute bar to recovery against a public entity or its employees."  Brennan, 350 F.3d at 431 (citing N.J. Stat. Ann. § 59:8-3).

Plaintiff has not provided nor alleged facts showing that she served Defendants with notice of intent to sue within ninety days of the accrual of the cause of action.[6] Defendants provided a record from the New Jersey Department of Treasury to evidence that Plaintiff has not filed a notice of intent.  (See Ex. 85 to Jones Certification, Certification of Theresa Adams, Chief of the Bureau of Risk Management for the State of New Jersey, Department of Treasury.)

---

[6]  Unless damage is unknown and undiscoverable at the time of commission, "a cause of action accrues when the tort is committed"  Torres v. Jersey City Medical Center, 140 N.J. Super. 323, 326, 356 A.2d 75, 77 (N.J. Super. Ct. Law Div. 1976).

**NOT FOR PUBLICATION**

Plaintiff has not abided by the notice requirements of the TCA.  Defendants' motion for summary

judgment against Plaintiff's tort claims is granted.


<u>**CONCLUSION**</u>

Defendants' motion for summary judgment against all claims by Plaintiff is granted in its

entirety.



June 2, 2008                                          <u>**s/William H. Walls**</u>
                                                    United States Senior District Judge